IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

UNITED STATES OF AMERICA                          PLAINTIFF

V.                          NO. 13-50047

JUAN ARAIZA-CARRILLO                              DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Now before the Court is a Motion to Suppress filed by Defendant Juan Araiza-Carrillo and the Government's Response thereto. (Docs. 18, 20). A hearing on said motion was held on July 8, 2013, and the matter is now ripe for report and recommendation. After considering the testimony of the witnesses and the briefs and arguments presented by the parties, the Court makes the following findings and recommendations.

## BACKGROUND

1.    On January 21, 2013, a traffic stop was conducted of a vehicle in which the Defendant was a passenger. The driver of the vehicle, Amy Hernandez, consented to a search of the vehicle and a false social security card was discovered rolled up inside a soda bottle located in the center console of the vehicle.

2.    During a subsequent interview of Hernandez, she implicated the Defendant in a false-document making operation, which led to the issuance of a search warrant for the Defendant's residence. The evidence obtained during the search led to the Defendant being charged in a five-count indictment

-1-

with possession with the intent to unlawfully use and transfer false identification documents, in violation of 18 U.S.C. § 1028(a)(3); possession of document-making implements and authentication features with the intent to use such in the production of false identification documents, in violation of 18 U.S.C. § 1028(a)(5); trafficking in false authentication features for use in false identification documents, document-making implements, and means of identification, in violation of 18 U.S.C. § 1028(a)(8); and forging, counterfeiting, altering, falsely making, and possessing a false Arkansas driver's license and Arkansas identification card, in violation of 18 U.S.C. § 1546(a).

3.   In the motion to suppress now before the Court, the Defendant argues that there was not reasonable suspicion for the officer to stop the vehicle and that Hernandez did not have authority to consent to the search of the vehicle, as she was not the registered owner of the vehicle.  The Government responds that the stop was valid, as the officer had probable cause to stop the vehicle for failing to signal properly before turning, and also had reasonable suspicion to believe that criminal activity was afoot.  The Government alternatively argues that even if the stop was not supported by probable cause or reasonable suspicion, Hernandez had authority to consent to

AO72A
(Rev. 8/82)

a search of the vehicle and her consent purged any taint of an illegal stop.

## TESTIMONY

4. **Officer Cody Ross**

Officer Cody Ross, a narcotics and gang investigator with the Springdale Police Department Crime Suppression Unit, testified to the following:

On January 21, 2013, Officer Ross was patrolling the area around the Springdale airport, as it is known to be a high-crime area and to be frequented by members of two different gangs. There had also been numerous drug arrests in this area. Officer Ross was patrolling the area on the lookout for suspicious activity and was also attempting to show a police presence in the area. At approximately 5:30 p.m., Officer Ross was traveling east on Caudle Street when he observed a car parked on Caudle Street with a female, later identified as Hernandez, in the passenger seat and observed a Hispanic male, later identified as the Defendant, exiting a residence at 910 Caudle Street. Over the previous three to four months, Officer Ross had observed numerous subjects who appeared to be gang members coming and going from this residence and one gang had posted a picture of itself in front of the residence on Facebook.

The Defendant caught Officer Ross' attention because he was exiting the residence at "kind of a jog," but he stopped "dead

-3-

in his tracks" when he saw Officer Ross.  Defendant hesitated and turned as if he was going to go back into the house, but he then proceeded to the parked car.  Officer Ross described both the Defendant and Hernandez as having a "a deer caught in the headlights look," like they had been caught doing something, when they saw Officer Ross.

Based on Defendant's behavior and the location he was coming from, Officer Ross decided to follow the vehicle and called in its tag number. Defendant's Exhibit 1 is the vehicle registration, which reflects the owner's name and address as Francisco Araiza, 603 Harris Street in Springdale.  According to Officer Ross, the dispatcher identified and pronounced the registered owner's name as Ariela Francisco.  Officer Ross assumed this to be the name of a hispanic female.

As he was following the vehicle, Officer Ross could see both the Defendant, who was driving the vehicle, and Hernandez watching him.  Officer Ross then observed the vehicle make a last minute turn onto Powell Street, using its turn signal only as it turned and failing to signal within 100 feet of the turn, in violation of Arkansas law.[1]  It appeared to Officer Ross that the Defendant and Hernandez were attempting to evade him, as they then made the first turn they could into an apartment

---

[1]Officer Ross initiated his dash camera after this turn.  The video of the events leading up to the stop, as well as the stop itself, was admitted as Government's Exhibit 2.

-4-

complex.  Officer Ross circled around the block because he knew Defendant and Hernandez were watching him and he did not want them to think he was following them.  As he circled back, he saw a vehicle he believed to be theirs and he began following it, but he then realized it was the wrong vehicle and he accelerated back to the apartment complex.  As Officer Ross returned to the complex, he saw Defendant and Hernandez pulling out from the complex and he became even more suspicious of their activity, as they had switched drivers, with Hernandez now driving.  At that point, Officer Ross decided to stop the vehicle based upon reasonable suspicion of criminal activity.  Officer Ross acknowledged that if Defendant and Hernandez would have remained at the apartment complex, he would have taken no further action.

Upon stopping the vehicle, Officer Ross advised Hernandez that he stopped the vehicle because he thought her and Defendant's behavior was suspicious and they had switched drivers.  Officer Ross also mentioned Defendant's failure to properly signal before turning, but Officer Ross acknowledged at the hearing that was not the purpose for the vehicle stop and that he did not question the Defendant about this.  Hernandez advised Officer Ross that they switched drivers because the Defendant did not have a driver's license.  As Officer Ross had probable cause to issue the Defendant a traffic citation for failure to properly signal or even arrest him for driving

-5-

without a license, he asked the Defendant for his identification. Defendant provided Officer Ross with "some sort of consular card" identifying him as Juan Francisco Carrillo. Defendant's name and date of birth did not return any record on file with the state and neither the name on Defendant's identification nor on Hernandez's driver's license matched the name of the registered owner of the vehicle reported by dispatch.

Officer Ross described Hernandez as appearing nervous: her hands were shaking, she was breathing heavily and fidgeting, and her carotid artery was throbbing.   Officer Ross acknowledged that Defendant did not appear to be nervous, and, while he would not make eye contact with Officer Ross, Officer Ross acknowledged that this could be a sign of respect in the Hispanic culture.  Because of Hernandez's behavior and what he had observed prior to the stop, Officer Ross asked Hernandez to step out of the vehicle and he began a "roadside interview," which he characterized as small talk about where she and Defendant were coming from and going to, her relationship with the Defendant, and where they lived.  The small talk appeared to calm Hernandez down and Officer Ross then asked her if she had anything illegal on her person or in the vehicle.  Hernandez initially responded, "no," but she appeared to become nervous again.  Officer Ross advised Hernandez that if she had something

-6-

illegal, she should just tell him.  Hernandez then admitted to Officer Ross that she had a methamphetamine pipe in her purse in the vehicle.   After speaking with Hernandez for about five minutes, Officer Ross asked her for consent to search the vehicle.  Hernandez gave Officer Ross verbal consent to search the vehicle.  Officer Ross explained that it is not standard practice in his department to obtain written consent from suspects or to advise them of the right to refuse consent.

Officer Ross did not believe either Hernandez or Defendant to be the registered owner of the vehicle, as neither of their names matched the registered owner's name relayed to him by dispatch, and Hernandez had also advised Officer Ross that she and Defendant lived at the Heritage Inn motel, an address different than that on the vehicle registration.  Officer Ross assumed that Hernandez had authority to consent to the search of the vehicle, given that she was driving the vehicle and in control of it.  Officer Ross explained that when he stopped the vehicle, he asked Hernandez for the registration, but she could not immediately locate it, so he just asked her to step out of the vehicle and began questioning her, as he had already run the vehicle's tag through dispatch.

After Hernandez gave consent to search the vehicle, Defendant, who had been sitting calmly in the passenger seat of the vehicle, was asked by an officer who arrived to act as back-

AO72A
(Rev. 8/82)

up to exit to the vehicle.  Officer Ross asked the Defendant if he could search his person.  Officer Ross acknowledged that Defendant did not appear to speak fluent English and there appeared to be a "small language barrier," but Officer Ross used hand gestures and Defendant appeared to understand Officer Ross, as he began emptying his pockets.  Officer Ross found a bundled up piece of paper that appeared to contain methamphetamine, at which point, Officer Ross placed the Defendant in handcuffs and arrested him for possession of a controlled substance and placed him in the backseat of the patrol car.

Officer Ross then began searching the vehicle.  He placed Hernandez under arrest after finding a methamphetamine pipe in her purse as she had described.  Officer Ross then noticed a coke bottle in one of the cupholders with what appeared to be a counterfeit social security card.  After subsequently interviewing Hernandez about the social security card, officers obtained a state-court search warrant for 1705 Lowell Road, Apartment G105, Springdale, Arkansas, identified by Hernandez as Defendant's residence and the location where he made forged documents for illegal aliens.  Evidence seized during the search resulted in the charges now pending against the Defendant.

   5.  **Defendant**

Defendant testified that his full name is Juan Francisco Araiza-Carillo.  According to Defendant, he is the owner of the

vehicle in question and he registered it under his partial name, "Francisco Araiza."

### 6.   **Detective Rick Frisby**

Detective Rick Frisby with the Springdale Police Department testified that he is a case agent with the Homeland Security Investigation's task force.  According to Detective Frisby, he identified Defendant through his fingerprints with NCIC as being Juan Francisco Araiza-Carrillo, and Defendant has no known aliases with the first name Francisco.  Detective Frisby testified that the name Francisco J. Araiza-Carillo was identified as an individual with a date of birth in 1957, which the Defendant acknowledged was not his year of birth.  Detective Frisby testified that he obtained a search warrant for the Defendant's cell phone, and on the receipt form acknowledging that the cell phone had been taken from his property at the jail, Defendant signed his name, "Juan FCO. Araiza. C."

### 7.   **Rafael Marquez**

Rafael Marquez testified that he is an investigator and interpreter for the Federal Public Defender's Office.  Marquez, a native of Mexico, testified that FCO is a hispanic abbreviation for Francisco, and that not making eye contact is a sign of respect in his culture.

AO72A
(Rev. 8/82)

## DISCUSSION

8.   The Fourth Amendment prohibits "unreasonable searches and seizures."   A traffic stop constitutes a seizure of a vehicle's occupants, including any passengers, and thus, must be supported by reasonable suspicion or probable cause.  See United States v. Hollins, 685 F.3d 703, 706 (8th Cir. 2012).  Whether probable cause or reasonable suspicion existed is not to be determined with the vision of hindsight, but by looking at what the officer reasonably knew at the time.  Id.

9.   **Probable Cause for Traffic Stop**

It is well established that even a minor traffic violation provides probable cause for a traffic stop.  See United States v. Coleman, 700 F.3d 329, 334 (8th Cir. 2012), cert. denied, 133 S. Ct. 2369 (2013).  "Any traffic stop is constitutional, no matter the officer's actual motive, so long as the officer had probable cause to believe that a traffic violation actually occurred."  United States v. Long, 320 F.3d 795, 798 (8th Cir. 2003).  An officer is not required to act immediately upon acquiring probable cause to believe that a vehicle has committed a traffic violation.  See United States v. Smith, 2008 WL 5332117, *3 (S.D. Ga. 2008), report and recommendation adopted as modified, 2008 WL 5332085 (S.D. Ga. 2008); United States v. Scopo, 19 F.3d 777, 780 (2nd Cir. 1994), cert. denied, 513 U.S.

-10-

877 (traffic stop lawful where police observed traffic violation and followed car for 2.2 miles before stopping it).

Defendant's failure to signal within 100 feet of making a turn onto Powell Street constituted a traffic violation under Arkansas law.  See Ark. Code Ann. § 27-51-403(b).  Accordingly, Officer Ross had probable cause to stop the vehicle.  The brief, few-minute delay between the time Officer Ross observed the traffic violation and stopped the vehicle does not negate probable cause.  See United States v. Davis, 2010 WL 610646, *10 (C.D. Ill. 2010), aff'd 418 Fed. Appx. 556 (7th Cir. 2011) (few minute delay between observance of traffic violation and time at which officers came upon the vehicle was not excessive and lack of constant surveillance of vehicle did not negate probable cause).  Further, whether or not the traffic violation formed the basis for Officer Ross' ultimate decision to stop the vehicle is of no consequence, as an officer's subjective motivations are irrelevant as long as probable cause existed to believe that a traffic violation occurred.  See id.

Accordingly, the undersigned concludes that the traffic stop was valid, as Officer Ross had probable cause to believe that a traffic violation occurred.

10. **Reasonable Suspicion for Traffic Stop**

Even absent probable cause, the undersigned believes Officer Ross had reasonable suspicion to conduct the stop.  "'An

-11-

investigatory, or *Terry*, stop without a warrant is valid only if police officers have a reasonable and articulable suspicion that criminal activity may be afoot.'" United States v. Allen, 705 F.3d 367, 369 (8th Cir. 2013) (quoting United States v. Navarrete-Barron, 192 F.3d 786, 790 (8th Cir. 1999)) (citing Terry v. Ohio, 392 U.S. 1, 25-31 (1968)).  Officers have reasonable suspicion if they can point to "'specific and articulable facts,'" giving rise to a "'particularized and objective basis for suspecting legal wrongdoing.'"  United States v. Chantharath, 705 F.3d 295, 302 (8th Cir. 2013) (internal citations omitted), pet. cert. filed, (Apr. 16, 2013). In determining whether reasonable suspicion exists, the Court must look at the totality of the circumstances, giving due deference to the officers' law enforcement experience and training.  Id.

Officer Ross testified that he believed he had reasonable suspicion that Defendant and Hernandez were engaged in criminal activity based upon the following:

* the area at issue was a high-crime area, frequented by gang members;

* there had been numerous drug arrests in the area;

* suspected gang members had been seen coming and going from the residence Defendant was leaving and a gang had posted a picture of itself standing in front of

-12-

this residence on Facebook;

*    the Defendant stopped "dead in his tracks" from a jog when he saw Officer Ross, hesitated, and turned as if he was going to return to the house;

*    both Defendant and Hernandez looked like "a deer caught in the headlights" when they saw Officer Ross;

*    both Defendant and Hernandez were watching Officer Ross as he was following their vehicle; and

*    they appeared to be trying to evade Officer Ross by turning quickly onto Powell Street and then into an apartment complex and switching drivers.

While none of these circumstances, standing alone, would give rise to reasonable suspicion, the undersigned believes that the totality of these circumstances, taken together with rational inferences from these circumstances, supported the stop of the vehicle based upon reasonable suspicion. Cf. Illinois v. Wardlow, 528 U.S. 119, 124-26 (2000) (an individual's presence in a high crime area, unprovoked flight, and nervous, evasive behavior were all relevant factors in determining reasonable suspicion); United States v. Williams, 577 F.3d 878, 881 (8th Cir. 2009) (attempt to evade arrest by turning back into the home after seeing police was a factor supporting officers' reasonable suspicion); United States v. Gilliam, 520 F.3d 844, 847 (8th Cir. 2008) (citing authorities for the proposition that

-13-

suspicious behavior and presence in high crime area creates reasonable suspicion); United States v. Junvenile TK, 134 F.3d 899, 903 (8th Cir. 1998) (police are entitled to be suspicious of vehicular movement that, while not illegal, may be reasonably perceived as evasive); United States v. DeJear, 552 F.3d 1196, 1201 (10th Cir. 2009), cert. denied, 129 S. Ct. 2418 (factors supporting reasonable suspicion included fact that house was in an area known for criminal activity, officer had seen people standing outside of it wearing gang colors, and defendant made nervous, furtive movements); United States v. Riley, 493 F.3d 803, 809-10 (7th Cir. 2007) (switching of drivers was a factor indicative of criminal activity).

11. **Consent to Search the Vehicle**

Even if the traffic stop was not supported by probable cause or reasonable suspicion, consent to search the vehicle would have purged the taint of any alleged Fourth Amendment violation. See United States v. Barnum, 564 F.3d 964, 969 (8th Cir. 2009). Defendant challenges the search of the vehicle, arguing that Hernandez did not have authority to consent to the search, as she was not the owner of the vehicle.

The undersigned first addresses whether Defendant, a passenger in the vehicle at the time of the stop, has standing to challenge the search. A passenger in a vehicle has standing to challenge a traffic stop because the passenger is considered

-14-

"seized" during the stop.  See <u>Brendlin v. California</u>, 551 U.S. 249, 255, 259 (2007); <u>United States v. Crippen</u>, 627 F.3d 1056, 1063 (8th Cir. 2010), <u>cert. denied</u>, 131 S. Ct. 2914 (2011). However, a mere passenger in a vehicle does not have standing to challenge the search of the vehicle because he does not have a reasonable expectation of privacy in it.  <u>Crippin</u>, 627 F.3d at 1063.

The car registration does not definitively establish that Defendant owned the vehicle in question.  The registration reflects the owner's name as Francisco Araiza, with an address different than that identified by Hernandez as Defendant's residence during the traffic stop and during her subsequent interview.  Defendant testified that the vehicle belonged to him and that, while his full name is Juan Francisco Araiza-Carillo, he registered it under his partial name of Francisco Araiza. Detective Frisby testified, however, that Defendant has no known aliases with Francisco as his first name; that he signed Juan as his first name on the search warrant receipt for his phone; and that Defendant has a different date of birth than the individual identified by law enforcement as Francisco J. Araiza-Carillo.

Assuming, without deciding, that Defendant was the owner of the vehicle and thus, has standing to challenge the search of the vehicle, the undersigned finds no merit to Defendant's argument that Hernandez did not have authority to consent to a

-15-

search of the vehicle.   The relevant inquiry is whether the facts available to Officer Ross would have justified a reasonable officer in believing that Hernandez had authority over the vehicle.   See United States v. Chavez Loya, 528 F.3d 546, 554 (8th Cir. 2008).   A driver of a vehicle, absent an objection from the owner of the vehicle, has authority to consent to a search of the vehicle.   See United States v. Eldridge, 984 F.2d 943, 948 (8th Cir. 1993).

The evidence indicates that Officer Ross believed, based on information provided by dispatch when he called in the vehicle's tag, that the registered owner of the vehicle was a hispanic female by the name of Ariela Francisco.   Officer Ross had no reason to believe that Defendant was the registered owner of the vehicle, especially in light of the fact that Hernandez informed him she was driving the vehicle because the Defendant did not even have a driver's license, and Hernandez advised Officer Ross that she and Defendant were residing at an address different than that of the registered owner.   While the Defendant may not have been fluent in the English language, he could have attempted to show Officer Ross the vehicle registration and identified himself as the owner and to signal some sort of objection to the search of the vehicle.   Defendant did not do so and the undersigned believes that Officer Ross was justified in

-16-

believing that Hernandez, as the driver of the vehicle, had authority to consent to a search of the vehicle.

## CONCLUSION

12. For the foregoing reasons, the undersigned hereby recommends that the Motion to Suppress (Doc. 18) be denied in all respects. **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

Entered this 17ᵗʰ day of July, 2013.


/s/ *Erin L. Setser*
_____
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)